**SCHERING CORPORATION,**
**Plaintiff–Appellant,**

v.

**ROUSSEL–UCLAF SA, Involuntary**
**Plaintiff–Appellee,**

v.

**ZENECA INC. and Zeneca Holdings**
**Inc., Defendants–Appellees.**

No. 96–1246.

United States Court of Appeals,
Federal Circuit.

Jan. 8, 1997.

Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, LLP, New York City, argued for plaintiff-appellant. With him on the brief were Jeffrey I.D. Lewis, Jennifer L. Pariser, Michael J. Timmons. Of counsel on the brief were Robert J. Trainor and Jane G. Wasman, Schering Corporation, Kenilworth, NJ.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington,

D.C., argued for involuntary plaintiff-appellee. With him on the brief was John R. Thomas. Also with him on the brief were James F. Lesniak, Joseph R. Re, and Joseph F. Jennings, Knobbe, Martens, Olson & Bear, Newport Beach, CA.

E. Anthony Figg, Rothwell, Figg, Ernst & Kurz, of Washington, D.C. argued for defendants-appellees. With him on the brief were Steven Lieberman and Joseph A. Hynds. Also with him on the brief were Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, and Joel M. Cohen, Davis, Polk & Wardwell, of New York City. Of counsel on the brief were William C. Lucas and Laura J. Davies, Zeneca, Inc., Wilmington, DE.

Before PLAGER, Circuit Judge, SMITH, Senior Circuit Judge, and BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

Plaintiff Schering Corporation (Schering) and involuntary plaintiff Roussel–UCLAF SA (Roussel) are co-owners of a pharmaceutical patent. In October 1995, Roussel granted a license under the patent to defendants Zeneca Inc. and Zeneca Holdings, Inc. (collectively, Zeneca). Shortly before the license was granted, however, Schering filed an infringement action against Zeneca. When Zeneca sought to interpose the license as a defense, Schering responded that a prior agreement between Schering and Roussel barred Roussel from granting the license to Zeneca and that the license was therefore not a valid defense to Schering's charge of infringement. The district court granted Zeneca's motion for partial summary judgment, holding that the Schering–Roussel agreement did not render the Zeneca license invalid. We agree with the district court that Roussel was entitled to grant a license to Zeneca, and we therefore affirm.

## I

The patent in question, U.S. Patent No. 4,472,382 (the '382 patent), is a patent for a method of treating prostate cancer through the use of a combination of drugs. The treatment, referred to as "combination thera-py," calls for the use of an antiandrogen, a drug that neutralizes the effect of certain hormones in the body. One of the two inventors assigned his rights under the '382 patent to Roussel; the other inventor later assigned his rights to Schering.

Both Schering and Roussel developed antiandrogens. In 1989, Schering obtained approval from the Food and Drug Administration (FDA) to sell its antiandrogen, flutamide, in the United States for use in combination therapy. Roussel developed its own antiandrogen, nilutamide, which it sold abroad, but Roussel did not enter the United States market because Roussel's U.S. marketing partner was not interested in distributing nilutamide in the United States.

When a dispute arose in 1989 regarding the validity of the assignment by which Schering obtained its co-ownership interest in the '382 patent, Schering and Roussel sought to resolve their respective rights in the patent by agreement. Accordingly, the two parties executed a series of agreements governing their rights under the '382 patent and recognizing their status as co-owners. One of the agreements, the "co-ownership agreement," provided that each company would be allowed to market its antiandrogen in the United States for use in the patented combination therapy. Paragraph 5 of the agreement addressed the issue of third party infringement and provided as follows:

> Upon the discovery by any party of any infringement of [the '382 patent], such party shall notify the other diligently: if the parties agree to do so, appropriate legal action in connection therewith shall be undertaken by the parties jointly. In the event that such action is taken, each party shall contribute equally to the expenses of any such action. If any damages for infringement are awarded by a final decree or judgment, then after deducting all expenses arising from the litigation and reimbursing each party for its contributions, the remainder shall be divided equally among the contributing parties. If one party shall not wish to join or continue in any such action, but the other party shall wish to institute or continue such action, said one party shall render all reasonable

assistance to said other party in connection therewith at said other party's expense and said other party shall be entitled to retain all recoveries obtained with respect to such action.

In 1994, Zeneca was developing its own antiandrogen, bicalutamide. Zeneca contacted Roussel to explore the possibility of Zeneca's obtaining a license under the '382 patent so that it could sell bicalutamide for use in combination therapy. At about the same time, Schering contacted Roussel and proposed an arrangement under which Schering would obtain exclusive rights under the '382 patent. Roussel did not advise either Schering or Zeneca that it was engaged in discussions with the other.

In early 1995, Roussel elected to license Zeneca rather than grant exclusive rights under the '382 patent to Schering. Zeneca and Roussel then began negotiating the terms of the proposed license.

In April and May 1995, Zeneca began promoting bicalutamide, which it planned to sell in the United States after obtaining FDA approval. Upon learning of Zeneca's marketing plans, Schering advised Roussel by letter of what it termed Zeneca's "potential infringement" of the '382 patent; Schering explained that in its view the sale of bicalutamide for use in combination therapy would infringe the claims of the '382 patent when the drug was approved by the FDA. The letter requested that Roussel undertake joint legal action against Zeneca "as soon as the [FDA] approval is imminent"; if Roussel elected not to join Schering in the infringement suit, the letter stated, Schering expected that Roussel would "render all reasonable assistance to Schering Corporation" pursuant to paragraph 5 of the co-ownership agreement.

During September 1995, Roussel and Zeneca were actively negotiating a license under the '382 patent. On September 19, Schering attorneys called a Roussel representative to request Roussel's assistance in a possible lawsuit against Zeneca. The Roussel representative advised the Schering attorneys that Roussel was engaged in licensing negotiations with Zeneca. That afternoon, Schering filed an action against Zeneca in district court, alleging infringement of the '382 patent. By way of relief, Schering sought a declaration that Zeneca's "manufacture, sale and/or importation" of bicalutamide for use in combination therapy infringed the '382 patent and an injunction prohibiting Zeneca from making, selling, offering to sell, or importing bicalutamide for use in combination therapy. On the same day that it filed the complaint, Schering notified Roussel of the lawsuit and invoked its rights under paragraph 5 of the co-ownership agreement.

Two weeks later, the FDA approved bicalutamide for use in combination therapy, and Roussel and Zeneca promptly signed a licensing agreement. The Roussel–Zeneca agreement gave Zeneca a non-exclusive license to manufacture, import, use, sell, and offer to sell bicalutamide for any use that, if unlicensed, could constitute infringement of the '382 patent. The agreement also provided a license to all persons who purchased, prescribed, or used bicalutamide from Zeneca or from authorized third parties.

Zeneca answered by denying infringement and filing a counterclaim, in which it sought to have the '382 patent declared invalid and unenforceable, and also requested damages on an antitrust theory. Zeneca subsequently filed an amended answer in the Schering lawsuit, setting up the license agreement as a complete defense to Schering's claim of infringement.

The district court granted Zeneca's motion for partial summary judgment on Schering's complaint, rejecting Schering's argument that the co-ownership agreement barred Roussel from granting a license to Zeneca once Schering had filed its infringement suit. The court refused to adopt the general principle that an agreement between co-owners permitting either one to sue unilaterally for infringement "create[s] a mandatory rule of contract construction causing a co-owner to forfeit its right to license." The court further held that the provision in paragraph 5 of the co-ownership agreement requiring each co-owner to provide "reasonable assistance" in connection with infringement litigation brought by the other co-owner "does not

prevent Roussel from granting a license to Zeneca or any third party." Because it concluded that Roussel had granted a valid license to Zeneca, the court held that Zeneca enjoyed a complete defense against Schering's infringement claim. The court declined to reach the counterclaims asserted by Zeneca, but determined that judgment should be entered on the infringement claim under Fed.R.Civ.P. 54(b) so as to permit an immediate appeal to this court.

## II

### A

■ There is no dispute as to the principles that provide the backdrop for this case. Each co-owner of a United States patent is ordinarily free to make, use, offer to sell, and sell the patented invention without regard to the wishes of any other co-owner. 35 U.S.C. § 262. Each co-owner's ownership rights carry with them the right to license others, a right that also does not require the consent of any other co-owner. *See, e.g., Willingham v. Star Cutter Co.,* 555 F.2d 1340, 1344, 194 USPQ 249, 253 (6th Cir.1977) ("a co-owner of a patent can even grant a license to a third party without consent of the other owners"); *Talbot v. Quaker State Oil Ref. Co.,* 28 F.Supp. 544, 548 (W.D.Pa.1938) (a co-owner "may make use of and sell specimens of the patented invention and may license others to do so; and neither he nor his licensees can be enjoined from a continuance in so doing"), *aff'd,* 104 F.2d 967 (3d Cir.1939). Thus, unless the co-owner has given up these rights through an "agreement to the contrary," 35 U.S.C. § 262, the co-owner may not be prohibited from exploiting its rights in the patent, including the right to grant licenses to third parties on whatever conditions the co-owner chooses.

In light of these principles, it is clear that if there were no agreement between the co-owners regarding their respective rights under the '382 patent, Schering would have no ground for objecting to Roussel's granting a license to Zeneca, and Zeneca would thereby obtain the right to engage in activities that would otherwise constitute actionable infringement. According to Schering, howev-

er, the 1989 co-ownership agreement—and paragraph 5 of the agreement in particular—changes all that.

### B

Schering makes two arguments in support of its contention that the co-ownership agreement renders Roussel's license to Zeneca invalid. First, Schering argues that because the co-ownership agreement grants each co-owner the right to bring suit unilaterally against third-party infringers, it must be read to limit each co-owner's right to license. Second, Schering contends that the requirement of "reasonable assistance" in paragraph 5 of the agreement restricts each co-owner's right to license, or at least raises a triable issue of fact with respect to that question.

### 1

■ Schering's principal argument is that the co-ownership agreement must be construed to limit the right of either co-owner to license third parties, because an unrestricted right to license would undermine the basic purpose of the agreement. Schering points to the fact that the co-ownership agreement gives each co-owner the unilateral right to sue on the '382 patent, *i.e.,* the right to bring suit for infringement of the patent without the other co-owner's voluntarily joining the suit. Absent such an agreement, Schering, as a co-owner, would not be able to sue for infringement if its co-owner Roussel declined to join the suit. *See, e.g., Willingham v. Lawton,* 555 F.2d at 1344, 194 USPQ at 252; *Cilco, Inc. v. Copeland Intralenses, Inc.,* 614 F.Supp. 431, 434, 227 USPQ 168, 170 (S.D.N.Y.1985); *Rainbow Rubber Co. v. Holtite Mfg. Co.,* 20 F.Supp. 913, 916–17 (D.Md. 1937).

The critical element in Schering's argument is its assertion that Roussel's granting Schering the unilateral right to sue is necessarily inconsistent with Roussel's granting a license to any party that Schering targets for a lawsuit. Schering argues that its unilateral right to sue would be rendered valueless if Roussel could defeat any lawsuit Schering brought by granting a license to the defendant. Further, Schering argues that the Sixth Circuit's decision in *Willingham v. Star*

*Cutter Co., supra,* supports its view that a co-owner that grants its fellow co-owner the unilateral right to sue waives any right to interfere with a lawsuit brought by that co-owner.

■ The flaw in Schering's argument is that the right to license is not incompatible with the unilateral right to sue, as Schering insists. It is true that by granting a license to a prospective infringement defendant, or to a defendant that has already been sued for infringement, a patent co-owner can effectively deprive its fellow co-owner of the right to sue for and collect any infringement damages that accrue after the date of the license. It is also true that the suing co-owner may not obtain an injunction against future acts of infringement by the licensee, since the license grants full protection against a claim of future infringement. But the grant of a license by one co-owner cannot deprive the other co-owner of the right to sue for accrued damages for past infringement. That would require a release, not a license, and the rights of a patent co-owner, absent agreement to the contrary, do not extend to granting a release that would defeat an action by other co-owners to recover damages for past infringement. *See Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co.,* 107 F. 487 (C.C.S.D.N.Y.1901); *Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co.,* 93 F. 197, 198–99 (C.C.S.D.N.Y.1899) (one co-owner lacks "the power ... to destroy the other's accrued right to damages").

Because a license granted by one co-owner cannot discharge an infringer's liability to the other co-owner for past infringement, the power to grant a license does not render the unilateral right to sue valueless. The grant of a license simply limits the relief that other co-owners can obtain by exercising their unilateral right to sue. The right to license and the unilateral right to sue are therefore not incompatible, and the granting of one does not necessarily imply the relinquishment of the other.

Contrary to Schering's argument, the Sixth Circuit's decision in *Willingham* does not suggest a different result. The issue in *Willingham,* as described by the court, was whether "a co-owner could authorize by contract another co-owner to file suit for patent infringement without the permission of the first co-owner, in an action in which the unwilling co-owner is joined as an involuntary plaintiff under Rule 19 [of the Federal Rules of Civil Procedure]." 555 F.2d at 1343, 194 USPQ at 252. Ordinarily, one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit. *See id.* at 1344, 194 USPQ at 255. The court in *Willingham* held that co-owners of a patent may alter this right by granting each other the unilateral right to sue. In so doing, the court held, each co-owner effectively waives the right to prevent a lawsuit and may be forced to appear as an involuntary plaintiff under Rule 19. *Id.* at 1345, 194 USPQ at 253.

Schering argues that *Willingham* stands for the broader proposition that when one co-owner with a unilateral right to sue invokes that right with respect to an unlicensed third party, the other co-owner may not interfere with the exercise of that right in any way, including by granting a license to the third party. That proposition, however, was not adopted by the *Willingham* court, either expressly or implicitly. Simply because a co-owner gives up its ability to afford its licensees complete protection against lawsuits does not mean that such a co-owner necessarily forfeits any aspect of its right to license. The leap that Schering makes—from an agreement giving a co-owner the right to sue to an implied surrender of the right to license once the co-owner brings such a suit—is not made by the *Willingham* court and is not supported by persuasive reasoning. The mutual conveyance of a unilateral right to sue may render each co-owner's licensees more vulnerable to suit, just as the mutual retention of the right to license renders each co-owner's right to sue potentially less valuable. But the fact that the right to license may affect the value of the unilateral right to sue does not render the right to sue illusory, as Schering contends.

2

■ For its second argument, Schering relies on the clause in the co-ownership agreement providing that if one of the co-

owners files an infringement suit, it can call on the non-suing co-owner to provide "reasonable assistance" in connection with the litigation. Schering contends that the "reasonable assistance" clause should be interpreted to bar the non-suing party from granting a license to a defendant or prospective defendant, or at least that the district court should not have granted summary judgment on that disputed question of contract interpretation.

The district court held that the "reasonable assistance" clause refers to litigation assistance, such as supplying documents and making witnesses available, not to matters such as the right to license. That interpretation accords with the plain meaning of the phrase "reasonable assistance to said other party in connection [with litigation]," and it derives further support from the proviso that the "reasonable assistance" is to be supplied at the expense of the suing party, a clause that would have no application to a form of "assistance" such as forgoing the right to license.

Schering asserts that extrinsic evidence supports its interpretation of the co-ownership agreement, but once again we disagree. Nothing in the circumstances surrounding the formation of the co-ownership agreement supports Schering's theory that the agreement was intended to restrict the right of the co-owners to license would-be infringers. Schering and Roussel entered into their co-ownership agreement to resolve a dispute regarding the validity of the assignment that resulted in Schering's claim of a co-ownership interest in the '382 patent. It contains no explicit statement of intention by either party to waive or otherwise limit the right to grant licenses under the patent. Moreover, Schering has not pointed to anything in the events leading to the execution of the co-ownership agreement that suggests that either party meant to relinquish the right to license would-be infringers.

In contending that the extrinsic evidence supports its interpretation of the "reasonable assistance" clause, Schering relies heavily on the 1995 negotiations between Roussel and Zeneca. During those negotiations, Zeneca agreed to indemnify Roussel for any liability arising from a claim made by Schering as a result of the Roussel–Zeneca license, and Roussel agreed to return $2,000,000 in licensing fees to Zeneca if the license should be nullified. The Roussel–Zeneca negotiations, however, took place more than five years after the execution of the co-ownership agreement and thus were of limited relevance to the intentions of Roussel and Schering at the time they executed the agreement. More importantly, the protections that Roussel and Zeneca provided to one another establish nothing more than that Roussel and Zeneca were aware that there was some risk that a court would agree with Schering's interpretation of the co-ownership agreement, and that they sought to guard against that contingency. The parties' desire to protect against the risk of an unfavorable construction of the co-ownership agreement is not persuasive evidence that the agreement should be read in that unfavorable manner. We therefore do not agree with Schering that the Roussel–Zeneca negotiations create a triable question of fact as to the proper interpretation of paragraph 5 of the co-ownership agreement.

We also reject Schering's reliance on the testimony of Zeneca's expert witness given in response to a hypothetical question asked on cross-examination. Counsel for Schering asked the witness to assume that a promise of immunity from suit was removed from the Roussel–Zeneca license "specifically to permit Roussel to sue Zeneca for patent infringement." In that hypothetical setting, the expert testified, Roussel "should not have granted a license." In fact, there is no evidence that Roussel had any intention of granting a license and then initiating an infringement suit against Zeneca. Although the co-ownership agreement made Roussel subject to being named as an involuntary plaintiff in an infringement action brought by Schering, that status is quite different from the facts in counsel's hypothetical question, which posited Roussel's crafting the licensing agreement so that it could bring suit against its own licensee.

C

There is one remaining issue. The district court understood the parties to agree that

Zeneca did not infringe the '382 patent prior to the date on which it obtained its license from Roussel. On appeal, however, Schering has argued that some of Zeneca's pre-license conduct constituted infringement. Because the district judge apparently relied on what he understood to be the parties' agreement with respect to the question of past infringement, the district judge did not adjudicate that issue. In any event, Schering did not seek damages for past infringement in its complaint. Because this appeal was from an order granting partial summary judgment, the case must return to the district court for further proceedings. If Schering wishes to pursue its claim of pre-license infringement against Zeneca at that time, the district court may consider whether Schering has waived that claim and, if Schering has preserved its right to raise the claim, whether the claim has merit.

*AFFIRMED.*