# United States Court of Appeals for the Federal Circuit

06-1218

ISRAEL BIO-ENGINEERING PROJECT,

Plaintiff-Appellant,

v.

AMGEN INC., IMMUNEX CORPORATION,
WYETH, and WYETH PHARMACEUTICALS, INC.,

Defendants-Appellees,

and

YEDA RESEARCH AND DEVELOPMENT CO., LTD.,

Defendant-Appellee,

and

INTER-LAB LTD. and SERONO INTERNATIONAL S.A.,

Defendants-Appellees.

Thomas L. Hamlin, Robins, Kaplan, Miller & Ciresi L.L.P, of Minneapolis, Minnesota, argued for plaintiff-appellant Israel Bio-Engineering Project. With him on the brief were Stephen P. Safranski, Brian A. Mayer, and Ross A. Abbey.

Barbara R. Rudolph, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P, of Washington, D.C., argued for defendants-appellees Amgen Inc., et al. With her on the brief were Gerald F. Ivey and William L. Strauss. Of counsel on the brief were Stuart L. Watt, Monique L. Cordray, Karen L. Nicastro, Kathleen Fowler, and Gail Katz, Amgen Inc., of Thousand Oaks, California; Vicki G. Norton, Wilson Sonsini Goodrich & Rosati, P.C., of San Diego, California; and Nicole W. Stafford, Wilson Sonsini Goodrich & Rosati, P.C., of Austin, Texas.

Nicholas Groombridge, Weil, Gotshal & Manges LLP, of New York, New York argued for defendant-appellee Yeda Research and Development Co., Ltd. With him on the brief were Michael Eisenberg, Daniel J. Melman, and Peter Sandel. Of counsel was John D. Garretson, Fish & Richardson, P.C. of New York, New York.

Wayne M. Barsky, Gibson, Dunn & Crutcher LLP, for defendants-appellees Inter-Lab Ltd., et al of Los Angeles, California.

Appealed from: United States District Court for the Central District of California

Judge R. Gary Klausner

# United States Court of Appeals for the Federal Circuit

06-1218

ISRAEL BIO-ENGINEERING PROJECT,

Plaintiff-Appellant,

v.

AMGEN, INC., IMMUNEX CORPORATION,
WYETH, and WYETH PHARMACEUTICALS, INC.,

Defendants-Appellees,

and

YEDA RESEARCH AND DEVELOPMENT CO., LTD.,

Defendant-Appellee,

and

INTER-LAB LTD. and SERONO INTERNATIONAL, S.A.,

Defendants-Appellees.

—————————

DECIDED: January 29, 2007

—————————

Before BRYSON, PROST, <u>Circuit Judges</u>, and SARIS, <u>District Judge</u>.[*]

SARIS, <u>District Judge</u>.

This appeal involves a complex dispute over the ownership of a patent. Plaintiff-

Appellant Israel Bio-Engineering Project ("IBEP") appeals from a judgment in a patent

—————————

[*]      Honorable Patti B. Saris, District Judge, United States District Court for the
District of Massachusetts, sitting by designation.

infringement action granting Defendant-Appellee Yeda Research and Development Company, Ltd.'s ("Yeda") motion for summary judgment on the ground that IBEP lacked standing to bring the suit because it did not have sole ownership of the patent. This court affirms.

## FACTUAL BACKGROUND

### 1. Four Contracts

This dispute over ownership of the patent involves four inter-related contracts. Yeda is an Israeli corporation that markets and commercializes inventions resulting from research conducted at the Weizmann Institute of Science, a multi-disciplinary research institute. Yeda entered into negotiations with Inter-Yeda Ltd., a joint venture formed in Israel in 1979 between Yeda and Inter-Pharm, an Israeli company wholly owned by Serono International S.A., to finance various Weizmann research projects and to commercialize the results of the research. On September 14, 1981, Yeda and Inter-Yeda executed a handwritten agreement, which provided that Inter-Yeda would finance four specified research projects during a five year project term, including the one at issue here. This initial agreement was later amended, as will be explained later. That same day, Yeda sent a side letter to Inter-Yeda offering to cooperate with Inter-Yeda in revising the contract if it found outside funding.

Shortly afterwards in 1982, Inter-Yeda began negotiating with IBEP, a New York limited partnership, to secure funding for the four research projects. These negotiations generated three agreements. First, on December 27, 1982, IBEP entered into a contract with the State of Israel ("the R&D Contract") whereby IBEP committed to spend between

$7 million and $10 million on four research programs.  Paragraph 5 of the R&D Contract provides: "[IBEP] will be entitled, [subject to two paragraphs which are not applicable], to exploit all the Research results, including any Patents, in any manner, including the manufacture of Products, granting of licenses, transfer and/or sale of any rights in any matter resulting from the Research."  The Israeli government consented to the terms of the two contracts which IBEP and Inter-Yeda were about to enter.  Three days later, IBEP signed a pair of contracts with Inter-Yeda on December 30, 1982.  All three contracts were set to expire on December 27, 1987, and were to be construed in accordance with the laws of the State of Israel.[1]

The first contract between IBEP and Inter-Yeda, called the Sub-Research and Development Contract ("Sub-R&D Contract"), provided that IBEP would fund the research operations conducted by Inter-Yeda in cooperation with Yeda.  Of particular significance to this dispute, Paragraph IX(A) of this contract specified:

> On behalf of the Partnership [IBEP], Developer [Inter-Yeda] shall apply for and obtain patents in Developer's and/or Yeda's name(s) on all inventions resulting from the R&D Programs which Developer, in its sole discretion, considers advisable to apply for and obtain; provided, however, that the beneficial ownership of all rights, title and interest in and to such patents and patent applications that form a part of the Proprietary Information shall be and hereby are assigned to the Partnership from the date the Partnership shall have made the first payment to the Developer pursuant to this Agreement in perpetuity, unless and until the Developer shall have purchased the Proprietary Information in respect thereof according to the provisions of the TOS Agreement.

(Emphasis added).  Paragraph X(A), entitled "Property Rights," then provides:

---

[1]  Portions of one of the three agreements — the so-called TOS Agreement — were set to expire well beyond 1987.  However, these sections are largely irrelevant.

Subject to the provisions of the TOS Agreement, any and all of the Proprietary Information shall become the sole property of the Partnership [IBEP]. Subject to the provisions of Paragraph IX above regarding the registration of patents in Developer's [Inter-Yeda's] and/or Yeda's name(s), Developer shall assign to [IBEP] all its rights, title and interest in and to the Proprietary Information and shall require all persons employed by it, presently or in the future, to do the same unless and until Developer shall become the owner of all of the Partnership's rights, title and interest in and to the Proprietary Information in accordance with the TOS Agreement. Nothing contained herein shall prevent Developer from including in any patent registration the name(s) of the individual inventor(s) as required by law, provided that no proprietary rights are vested in such individuals.

For purposes of this contractual provision, the term "Proprietary Information" was defined, in relevant part, to mean:

any and all inventions, patent applications and patents (wherever applied for or granted), trade secrets, technical information (including all blueprints, plans, workbooks, drawings, specifications, formulas and processes) and other technology or knowhow developed in the R&D programs.

(Emphasis added). The R&D Programs referenced by this agreement were designed to "be effective for a period co-terminous with . . . the Execution Period defined in the R&D Agreement" with Israel, that is until December 27, 1987.

The other contract between IBEP and Inter-Yeda is the Technology Option and Sale Agreement ("The TOS Contract"), which was executed on December 30, 1982. In the paragraph entitled "Property Rights," the contract repeats, "Any and all of the Proprietary Information developed during the term of the Sub-R&D Agreement shall become the sole property of the Partnership [IBEP] subject to the right of Inter-Yeda to exercise the Option with respect thereto, as provided in paragraph 5 hereof." (Emphasis added). In Paragraph 5, entitled "Options to Purchase Proprietary Information," the TOS Contract granted Inter-Yeda the sole and exclusive option to "purchase all of [IBEP's] rights, title and interest in

and to the Proprietary Information relating to each Product that has been Reduced to Practice or in respect to which a patent application has been filed prior to the expiration or termination of the Sub-R&D Agreement [December 27, 1987]." If Inter-Yeda timely exercised the option, it had to make certain payments to IBEP. Inter-Yeda never exercised that option.

Moreover, the TOS agreement expressly discusses research and development after the term of the Sub-R&D Contract. It gives IBEP the right to finance additional research and development if, after the term of the Sub-R&D agreement and during the term of the TOS Contract, Inter-Yeda "desires to conduct further research and development with respect to the Proprietary Information."[2] It then provides: "If after the termination of the Sub-R&D Agreement and during the term hereof, any Product is Reduced to Practice or if a patent application is filed with respect thereto, [IBEP] shall be entitled to payments . . . . " IBEP's right to royalties would be proportionately reduced if "more money is spent to conduct additional research and development . . . than has been spent by [IBEP]."

Finally, one day after IBEP and Inter-Yeda signed these contracts, Inter-Yeda and Yeda amended their original 1981 hand-scrawled agreements. This amended agreement distinguishes between "unrelated results," "pre-existing results," "new results," and "any other results." It provides: "The title in and to any New Result which will be discovered or developed during the Project Term other than an Unrelated Result shall belong to [IBEP] immediately upon its discovery or development." The parties agreed that title to any "pre-

---

[2]     There is no evidence that the provisions of this paragraph were triggered.

existing results" stemming from Yeda's research between September 14, 1981 and December 30, 1982 would still vest in Yeda. Moreover, it provides that title to "any other results which shall not belong to [IBEP]" would belong to Yeda. The "project term" of the 1981 contract was defined to be the five-year period of the contract effective September 14, 1981.

## 2. The Inventions

By April 1987 — after the expiration of the original 1981 contract, but prior to the termination of the 1982 contracts — three scientists, who worked in the R&D program directed at identifying novel anti-cellular factors, discovered and partially purified the Tumor Necrosis Factor Binding Protein ("TBP") in human urine. This protein, when bound to a substance in the body called the Tumor Necrosis Factor ("TNF"), proved capable of combating rheumatoid arthritis. TBP is the subject matter of U.S. Patent No. 5,981,701 (the "'701 patent") entitled "Tumor Necrosis Factor Inhibitory Protein and its Purification," which issued on November 9, 1999, naming four inventors: David Wallach, Hartmut Engelmann, Daniel Aderka, and Menachem Rubinstein. Yeda was named the assignee of the patent. The '701 patent contains three separate claims. '701 Patent col.16 ll.34-65. Claim 1 recites: "A protein capable of inhibiting the binding of TNF to cells and of inhibiting the cytotoxic effect of TNF, wherein said protein is obtainable from human urine" and has certain features. Id. col.16 ll.34-36. The parties do not dispute that this subject matter was discovered prior to the expiration of the Sub-R&D Agreement.[3] On September 13, 1987,

---

[3] While the record is not clear on this point, there still appears to be a dispute as to whether the invention took place in 1986 or 1987. This issue is not material to this appeal.

Yeda filed the Israeli patent application, No. 83878 (the "'878 priority document"), relating to these discoveries.

Claims 2 and 3 of the '701 Patent, however, relate to inventions made in 1988, after the termination of IBEP's Sub-R&D Contract with Inter-Yeda. Claim 2 covers "[a] substantially purified protein obtainable from human urine, capable of interacting with TNF so as to inhibit the binding of TNF to cells and to inhibit the cytotoxic effect of TNF" and containing a specifically identified amino acid sequence. Id. col.16 ll.51-55. Claim 3 recites "[a] pharmaceutical composition for use in treating conditions where TNF . . . is to be eliminated from the body or its effect in the body is to be antagonized, comprising a protein in accordance with claim 2 and a pharmaceutically acceptable carrier." Id. col.16 ll.60-65.

One of the named inventors, Dr. Menachem Rubinstein,[4] began working with the other inventors on this project in January 1988, after the expiration of the Sub-R&D Contract. Both parties agree that Rubinstein was brought into the research team at this time to help purify and sequence the protein listed in claims 2 and 3 of the '701 patent. He worked with Dr. Engelmann in 1988 "to complete the purification," in Rubinstein's words, and they purified it sufficiently to determine an amino acid sequence. The inventors were able to isolate and purify this protein and ascertain the amino acid sequence of this protein sometime during 1988. Rubinstein and the other inventors executed an agreement dated

---

[4] There is evidence that Rubenstein was the R&D manager of Inter-Yeda. Rubinstein was employed by both Weizmann and Inter-Yeda at the time of the invention. He worked four days a week for Inter-Yeda. The parties still seem to dispute his employment status, and we do not wade into that dispute here.

July 11, 1988, assigning their rights in the invention to Yeda.[5] The patent application was not filed until September 12, 1988; it claimed priority based on the '878 priority document filed in September 1987.

It is undisputed that Professor Rubinstein's special skills, in collaboration with Dr. Engelmann, resulted in the substantially purified TBP discussed in claims 2 and 3 of the '701 patent and in the patent application. Purification of the protein was needed to allow the scientists to determine the amino acid sequence. IBEP claims that one of the named inventors, David Wallach, partially purified the protein in 1987, although the record seems to support (at best) a finding that Wallach's "studies" were focused on purifying the protein and he was "attempting to do so." Indeed, the record demonstrates that in 1988, experiments to purify and characterize TBP were ongoing. Nevertheless, IBEP downplays Rubinstein's contribution as a continuation of Wallach's partial purification.

### 3. Litigation

In 2002, IBEP filed an action in the United States District Court for the Central District of California, alleging that the defendant pharmaceutical companies Amgen, Inc., Immunex Corporation, Wyeth, and Wyeth Pharmaceuticals, Inc. (collectively "Amgen") infringed claim 1 of the '701 patent with the pharmaceutical Enbrel®, a genetically engineered protein used to treat severe rheumatoid arthritis and psoriasis. Shortly after the filing of the suit, Yeda and Serono moved to intervene; only Yeda prevailed. In 2003, Yeda filed a motion for summary judgment against IBEP, arguing that IBEP could not claim

---

[5] "Under Israeli law, the discoveries of an employee are the property of his or her employer." Israeli Bio-Eng'g Project v. Amgen, Inc., 401 F.3d 1299, 1304 (Fed. Cir. 2005).

full title to the '701 patent because the inventors were not rightly considered Inter-Yeda employees at the time of the agreement and thus did not pass the invention by operation of Israeli law to Inter-Yeda, which was contractually required to assign title to IBEP. Agreeing with this argument, the district court granted the motion for summary judgment. IBEP appealed.[6] We reversed, holding there were genuine issues of material fact on the issue of whether the inventors were Inter-Yeda employees at the time of the invention under Israel law. Of significance to this appeal, this court held:

> On remand, if IBEP is able to establish that Wallach was an employee of Inter-Yeda at the time of the invention, IBEP may be able to establish that it has an ownership interest in the patent. IBEP can establish an ownership interest in the patent as long as the rights of even one of the inventors has passed to it. Even an ownership interest, however, would not be sufficient to give IBEP prudential standing to sue for infringement, as IBEP would have to join all the other co-owners in order to establish such standing.

Israel Bio-Eng'g Project v. Amgen Inc., 401 F.3d 1299, 1304-05 (Fed. Cir. 2005)[7] (citations omitted). We noted: "The district court did not reach the question of standing." Id. at 1305 n.4.

After the case was remanded to the district court, Yeda again moved for summary judgment, this time (not surprisingly) with a focus on standing. Yeda argued that IBEP lacked standing because the Sub-R&D Contract expired in 1987 and because claims 2 and 3 of the '701 patent were based on post-1987 discoveries outside of the project term. As such, total ownership of the entire patent could not have been passed to IBEP under the Sub-R&D Contract. At most, Yeda contended, IBEP could claim only a pro rata undivided

---

[6]    The original appeal involved other issues not relevant here.

[7]    In the previous appeal, this court allowed Serono and Inter-Lab, Ltd. to intervene. IBEP, 401 F.3d at 1307. These parties have joined in Yeda's brief.

share of the entire patent, and without full ownership of the '701 patent, IBEP lacked standing to sue.

In a well-reasoned opinion, the district court allowed the defendant's motion for summary judgment, holding that IBEP lacked standing because claims 2 and 3 of the '701 patent "did not fall within the operation of the sub-R&D agreement," and even if IBEP had an ownership interest in TBP, the subject matter in claim 1, IBEP "at most" had a partial interest in the whole patent. Israel Bio-Eng'g Project v. Amgen Inc., No. CV 02-06860 RGK (MANx) (C.D. Cal. Dec. 21, 2005). Stymied again, IBEP filed a timely notice of appeal. This court has appellate jurisdiction under 28 U.S.C. § 1295.

**DISCUSSION**

**1.    Standard of Review**

Whether a party has standing to sue is a question of law that this court reviews de novo. Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1376 (Fed. Cir. 2000). If Appellant did not have standing to maintain an infringement action, then jurisdiction is not proper on appeal. See id.

Although there are multiple ways to dispose of challenges to standing in the district court, the parties here addressed standing through a motion for summary judgment, one frequently used method. See generally 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.15 (2d ed. 1984) (pointing out that "[m]any cases have suggested that summary judgment procedure is appropriate," but arguing it is "better to use the preliminary hearing device as a means of requiring the plaintiff to carry the burden of establishing standing"). This court reviews a district court's

grant of summary judgment <u>de novo</u>. <u>Conroy v. Reebok Int'l, Ltd.</u>, 14 F.3d 1570, 1575 (Fed. Cir. 1994). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Johnston v. IVAC Corp.</u>, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989). In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion and with doubts resolved in favor of the opponent, which in this case is IBEP. <u>See</u> <u>Transmatic, Inc. v. Gulton Indus., Inc.</u>, 53 F.3d 1270, 1274 (Fed. Cir. 1995).

### 2. Ownership

The key question on appeal is whether IBEP had standing to maintain the patent infringement action against Amgen without the joinder of Yeda, the assignee of the patent. IBEP argues that it has standing because it is the sole exclusive owner of the patent by virtue of the Sub-R&D agreement.

It is a bedrock tenet of patent law that "an invention presumptively belongs to its creator." <u>Teets v. Chromalloy Gas Turbine Corp.</u>, 83 F.3d 403, 406 (Fed. Cir. 1996). Consistent with the presumption that the inventor owns his invention, the "[p]atent issuance creates a presumption that the named inventors are the true and only inventors." <u>Ethicon, Inc. v. U.S. Surgical Corp.</u>, 135 F.3d 1456, 1460 (Fed. Cir. 1998). When, as here, multiple inventors are listed on the face of the patent, each co-owner "presumptively owns a pro rata undivided interest in the entire patent, no matter what their respective contributions." <u>Id.</u> This holding that "a joint inventor as to even one claim enjoys a presumption of ownership in the entire patent" flows from the language of 35 U.S.C. § 116, which permits

joint inventors to "apply for [a] patent jointly" even though: "(1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent."

Still, issues of patent ownership are distinct from questions of inventorship. See Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248 (Fed. Cir. 1993) ("It is elementary that inventorship and ownership are separate issues."); see also Jones v. Hardy, 727 F.2d 1524, 1528 (Fed. Cir. 1984) ("each claim must be considered as defining a separate invention."). We have held: "All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998) (citations omitted).

This interplay between inventorship and ownership creates the anomalous situation that a co-inventor of even a single claim can then assert a right of joint ownership over an entire patent with multiple claims. See Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997) (citations omitted) ("One need not alone conceive of the entire invention, for this would obviate the concept of joint inventorship."); see also Ethicon, 135 F.3d at 1460 ("This rule presents the prospect that a co-inventor of only one claim might gain entitlement to ownership of a patent with dozens of claims.").

Thus, under the rule in Ethicon, a co-inventor of even one claim in the '701 patent, which has three claims, presumptively has a pro rata undivided ownership interest in the entire patent. For this reason, the district court held that IBEP had no standing to press its patent infringement action because Menachem Rubinstein was a co-inventor of the subject matter of claims 2 and 3, which was not discovered until after the conclusion of the R&D program, and therefore, IBEP did not have sole ownership of the patent.

### 3. Standing

IBEP contends that it had standing because under the terms of the Sub-R&D Contract it had the right to the assignment of title to all patents "resulting from" the R&D program. Standing to sue for infringement stems from the Patent Act, which provides: "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. As defined in § 100(d), "patentee" includes not only the patentee to whom the patent was issued but also "the successors in title to the patentee." 35 U.S.C. § 100(d).

Patent owners may assign or transfer their ownership interests in the patent as personal property. 35 U.S.C. § 261.[8] Under long established law, a patentee or his assignee may grant and convey to another: (1) the whole patent, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and throughout a specified part of the United States. See Vaupel Textile KG v. Maccanica Euro Italica, S.A.A., 944 F.2d 870, 873 (Fed. Cir. 1991); see also Waterman v. MacKenzie, 138 U.S. 252, 255 (1891) (holding that in the first and third cases, the assignee may sue

---

[8] Section 261 states that "patents shall have the attributes of personal property. Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument of writing."

in its name alone; in the second case, it may sue "jointly with the assignor"). Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing. IBEP, 401 F.3d at 1305 (citing Prima Tek II, 222 F.3d at 1377). With certain exceptions not applicable here, one co-owner has the right to limit the other co-owner's ability to sue infringers by refusing to join voluntarily in the patent infringement suit. Ethicon, 135 F.3d at 1468 (holding "as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiffs in an infringement suit"); see also Schering Corp. v. Roussel-UCLAF SA, 104 F.3d 341, 345 (Fed. Cir. 1997) ("One co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit."). Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing. Prima Tek II, 222 F.3d at 1377 (recognizing that the general rule that "a patentee should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee" was "prudential rather than constitutional in nature.").

IBEP claims it has standing to sue for patent infringement because it owns the whole patent by assignment. See Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000); Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc). To prevail, IBEP must establish that Inter-Yeda was contractually required to assign all Rubinstein's ownership rights in the '701 patent to it. Ownership depends upon "the substance of what was granted" through assignment. Vaupel Textile, 944 F.2d at 874. In construing the substance of the assignment, a court must carefully consider the intention of the parties and the language of the grant. Id.

### 4.     **The Scope of the Assignment**

To elude the steel trap of the Ethicon joint ownership rule, IBEP argues that the Sub-R&D Contract, read properly under applicable Israeli law, gives IBEP exclusive ownership over the patent because this agreement gives it the right to an assignment of "all rights, title and interest" to "all inventions resulting from the R&D Programs." IBEP contends that a genuine issue of material fact remains on the issue of whether Rubinstein's further purification of the protein described in claims 2 and 3 "resulted from" the R&D Program.

As a threshold matter, Yeda contends that this argument, as well as others, was waived because it was not presented in the district court and was raised for the first time on appeal. See Pentax Corp. v. Robison, 135 F.3d 760, 762 (Fed. Cir. 1998) (citations omitted) (stating that "this court will not address issues raised for the first time on appeal or issues not presented on appeal"). IBEP concedes — as it must — that it did not make this exact argument in support of ownership. Plaintiff argues that it is not making a new claim of ownership, but rather a new argument to support its persistent claim of ownership under the Sub-R&D Contract. See Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 379 (1995) (citations omitted) (holding that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below").

Ordinarily, this court has declined to consider arguments that were not presented to the district court. See, e.g., Pandrol U.S.A., L.P. v. Airboss Ry. Prods., Inc., 320 F.3d 1354, 1366-67 (Fed. Cir. 2003) (holding that defendant's arguments were waived when

they were not raised in response to the motion for summary judgment). "With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal." Sage Prods., Inc. v. Devon Indus., Inc. 126 F.3d 1420, 1426 (Fed. Cir. 1997) (declining to consider new infringement arguments on appeal). This rule serves the salutary purpose of permitting the trial judge most familiar with a complex record to address the issue first. Thus, any party who fails to raise an argument in the trial court does so at his peril.

This case, however, is in the gray area. IBEP based its original argument before the district court on the language of Paragraph IX of Sub-R&D Contract, albeit not the "resulting from" language also contained in that section. Because the parties argued about the meaning of this paragraph in the district court, we conclude they are not bound by the precise arguments raised below.

IBEP protests bitterly that it has never seen the fruits of its investments, and that any contract construction that gave it a non-exclusive ownership in an invention developed during the R&D period would defeat the intention of the parties in violation of Israeli contract law. According to IBEP's expert, under Israeli contract law, the meaning of a contract depends exclusively on the intention of the parties. (Decl. of Gabriela Shalev ¶ 22.) To determine the purpose of the contract, a court must consider "not just the contract language, but all of the extrinsic evidence regarding the circumstances surrounding the contract, particularly the negotiations prior to the formation of the contract and the parties' conduct in the course of performance and afterwards." See State of Israel v. Aprofim Hous. & Enter., 49(2) P.D. 265 at 40, ¶ 17 (1995) ("A contract is interpreted on

the basis of the parties' intent. This intent constitutes the goals, aims, interests, and plan that the parties wished jointly to implement.").

The question, then, is whether the parties intended only to assign to IBEP title to patents for Proprietary Information developed during the R&D period, which ended in December 1987, or whether they intended to give IBEP the right to the assignment of all patents, patent applications, or inventions resulting from the R&D programs. Yeda highlights the language in the Sub-R&D Contract that provides that "the beneficial ownership of all rights, title, and interest in and to such patents and patent applications that form a part of the Proprietary Information shall be and hereby are assigned to [IBEP]." (Emphasis added). The term "Proprietary Information" is in turn defined by the contract as patents, patent applications, and inventions "developed in the R&D programs." IBEP's interpretation is rooted in the first clause of the sentence of this paragraph which provides that on behalf of IBEP, Inter-Yeda "shall apply for and obtain patents" in its name and/or Yeda's name, "on all inventions resulting from the R&D Program which [Inter-Yeda], in its sole discretion, considers advisable to apply for and obtain." (Emphasis added). Put another way, IBEP's argument requires this court to discern the scope of the subject matter to which IBEP was assigned "all rights, title and interest."

IBEP's reliance on the "resulting from" language is not ultimately persuasive because that provision, when read as a whole, expressly limits IBEP's property rights by providing that IBEP should only receive "beneficial ownership of all rights, title and interest" in the Proprietary Information formed during the R&D program. By definition, the R&D program was of finite duration; thus, the period during which the Proprietary Information

could be discovered is time-limited. IBEP argues that the R&D Agreement between IBEP and Israel lends support to its interpretation because it gives IBEP an entitlement to exploit and commercialize "rights in any matter resulting from the Research." However, this document cannot be so broadly read because it also explicitly approves the time limitations incorporated in the Sub-R&D Contract by expressly referencing this agreement.

Moreover, Yeda's interpretation is more consistent with the intention of the parties as illustrated by the other contracts. According to IBEP's expert on Israeli law, "the interpretive rule of the contract as a whole relates not only to an isolated contract but also to a set of documents or agreements made between the same parties, as a reliable source in realizing the purpose of the contract." (Decl. of Gabriela Shalev ¶ 24.) The TOS Contract includes language that similarly limits property rights to Proprietary Information "developed in the R&D programs," which means "developed <u>during</u> the term of the Sub-R&D Agreement." (Emphasis added). This wording confirms the limited temporal scope of the Sub-R&D Contract's Proprietary Information term. By definition, when the R&D program ended in December 1987, IBEP was not entitled to further assignments of any other newly developed inventions, even when these inventions built on proprietary information developed during the R&D process. In the TOS agreement, the parties negotiated with exquisite detail IBEP's financial rights with respect to such subsequent research. While it may rue the bargain it struck, IBEP is bound by it.

Alternatively, IBEP protests that by combining the three claims in one patent, Inter-Yeda forfeited its rights to claims 2 and 3. However, under the Sub-R&D Contract, Inter-Yeda could file for patents in its discretion; it had the option under the Sub-R&D Contract

to aggregate claims invented during the R&D programs together with claims for inventions developed afterwards in the same patent, even though the effect of this decision was to deprive IBEP of exclusive ownership over the whole patent. Thus, even though there is some evidence to support IBEP's factual argument that Rubinstein's substantial purification of TBP was a continuation of work started by Wallach in the R&D program, IBEP has not claimed that the subject matter of claims 2 and 3 was discovered during that time period. Significantly, IBEP has not challenged inventorship, nor has it brought a breach of contract claim.

IBEP cites the well-established rule that patent assignments "attach to patents as a whole, not individual claims." Ethicon, 135 F.3d at 1466. While this is true, the Sub-R&D Contract governs IBEP's property rights, and it is entitled only to ownership of patents on the subject matter included within Proprietary Information, nothing more. As such, while an assignment of a patent must attach to the patent as a whole, here the issue was ownership of a future invention, which became the subject matter of only one claim.

In a final twist on its argument, IBEP argues that Rubinstein's assignment of the '701 patent to Yeda was a nullity because the patent assignment in the Sub-R&D Contract is a present assignment of future rights. FilmTec Corp. v. Allied-Signal Inc., 939 F.2d 1568, 1572 (Fed. Cir. 1991) ("If an assignment of rights in an invention is made prior to the existence of the invention, this may be viewed as an assignment of an expectant interest."). Under IBEP's theory, once the inventions in claims 2 and 3 were made and the patent application filed, legal title automatically flowed to it as the assignee, and the assignor-inventor Rubinstein had nothing left to assign to Yeda. Id. It argues that this interpretation

is consistent with the provision in the Sub-R&D Contract that "no proprietary rights" are vested in the named inventors. Again, this strained interpretation assumes incorrectly that IBEP had an "expectant interest" in Rubinstein's post-project term invention. This interpretation is inconsistent with the language of the contract and intention of the parties to preclude vesting of proprietary rights in the named inventors with respect to Proprietary Information, as defined.[9]

To sum up, Rubinstein was a presumptive co-owner of the patent because he was listed as one of four inventors on the face of the patent. It is undisputed that after the R&D program ended, Rubinstein, beginning in January 1988, discovered the substantially purified protein and the specific amino acid sequence described in claims 2 and 3 of the '701 patent. Rubinstein then assigned his ownership rights to Yeda. Rubinstein was not required to assign his ownership share to IBEP under the Sub-R&D Contract, and Yeda properly became a co-owner of the patent by virtue of claims 2 and 3. Even assuming IBEP has co-ownership of the patent under the Sub-R&D Contract because claim 1 was discovered in 1987, the district court properly ruled that IBEP has at most a pro rata undivided ownership interest in the '701 patent pursuant to the Sub-R&D Contract's assignment clause. Rubinstein's assignee, Yeda, also owns at least a pro rata undivided ownership interest in the whole '701 patent and throughout the two appeals has made it quite clear that it wants no part of the litigation. Without a complete ownership interest or the voluntary joinder of Yeda, IBEP lacks standing to sue for infringement.

## CONCLUSION

---

[9] Moreover, as this argument was not raised below, it is waived. See Pandrol U.S.A., 320 F.3d at 1366-67.

The Judgment of the United States District Court for the Central District of California is affirmed.

**<u>AFFIRMED</u>**