# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ADT HOLDINGS, INC., in its individual   )
capacity and as attorney-in-fact for   )
ZONOFF, INC., and ADT LLC,   )
  )
      Plaintiffs,   )
      v.   )  C.A. No. 2017-0328-JTL
  )
MICHAEL HARRIS and RING INC.,   )
  )
      Defendants.   )

## MEMORANDUM OPINION

Date Submitted: September 19, 2017
Date Decided: September 28, 2017

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Plaintiffs.*

Megan Ward Cascio, Lauren Neal Bennett, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Mark C. Scarsi, Ashlee N. Lin, Katherine R. Pierucci, J. Samuel Payne, MILBANK, TWEED, HADLEY & McCLOY LLP, Los Angeles, California; *Attorneys for Defendants.*

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Attorney for Nonparty Legrand Home Systems, Inc.*

**LASTER, V.C.**

On the eve of trial, nonparty Legrand Home Systems, Inc. ("Legrand") moved to seal certain trial exhibits so that they would not become part of the public trial record. Legrand also sought to close the courtroom for any testimony or attorney argument regarding the exhibits. Legrand claimed this relief was necessary because the exhibits contained sensitive, confidential information and that Legrand would suffer irreparable harm if the information was made public. The parties to the case did not oppose Legrand's motion. The court, however, bears an independent obligation to balance the harm Legrand claims it will suffer against the public right of access, which is at its height during a trial. Legrand's motion is denied.

"The public's right of access to judicial records has been characterized as fundamental to a democratic state."[1] The right of access enables the public to "judge the product of the courts in a given case."[2] This, in turn, "helps ensure 'quality, honesty and respect for our legal system.'"[3] Consequently, "all court proceedings are presumptively open to the public."[4]

---

[1] *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984).

[2] *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004).

[3] *Horres v. Chick-fil-A, Inc.*, 2013 WL 1223605, at *1 (Del. Ch. Mar. 27, 2013) (quoting *Cont'l Ill.*, 732 F.2d at 1308).

[4] *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 1653536, at *1 (Del. Ch. Jun 5, 2009) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 n.17 (1980)).

1

Court of Chancery Rule 5.1 "reflects the Court of Chancery's commitment to these principles."[5] It states that, "[e]xcept as otherwise provided" in Rule 5.1, "proceedings in a civil action are a matter of public record."[6] This language "makes clear that most information presented to the Court should be made available to the public."[7]

Rule 5.1(b)(3) provides that a "party or person seeking to obtain or maintain Confidential Treatment always bears the burden of establishing good cause for Confidential Treatment." Rule 5.1(b)(2) defines "good cause" as follows:

> For purposes of this Rule, "good cause" for Confidential Treatment shall exist only if the public interest in access to Court proceedings is outweighed by the harm that public disclosure of sensitive, non-public information would cause. Examples of categories of information that may qualify as Confidential Information include trade secrets; sensitive proprietary information; sensitive financial, business, or personnel information; sensitive personal information such as medical records; and personally identifying information such as social security numbers, financial account numbers, and the names of minor children.[8]

In determining whether good cause has been established, the court must "balanc[e] . . . the public interest against the harm that public disclosure might entail with respect to sensitive nonpublic information."[9] The court will not order confidential treatment "merely because

---

[5] *Horres*, 2013 WL 1223605, at *2.

[6] Ct. Ch. R. 5.1(a).

[7] *Sequoia Presidential Yacht Gp. LLC. v. FE P'rs LLC*, 2013 WL 3724946, at *2 (Del. Ch. July 15, 2013).

[8] Ct. Ch. R. 5.1(b)(2).

[9] *Reid v. Siniscalchi*, 2014 WL 6486589, at *1 (Del. Ch. Nov. 20, 2014).

2

disclosure has the potential for collateral economic consequences."[10] Instead, the harm must be "particularized."[11]

The fact that Legrand's motion is unopposed does not change these standards. Although the parties to the case have not opposed it, the motion seeks to overcome the public interest in open trials. The real opposition is from the public. Indeed, when considering such a motion, the court "serves not only the litigants before it; it has a public function as well."[12] It is therefore necessary for the court to examine Legrand's motion to determine whether it has carried its burden, notwithstanding the lack of a formal opposition to the motion.

Legrand also argued that, as a nonparty, it should benefit from a lighter burden when seeking to obtain confidential treatment. It is true that, when refusing to grant a party's motion to seal exhibits, the court has reasoned, in part, that "[t]hose who decide the litigate in a public forum (rather than pursue a private dispute-resolution procedure) must do so in a manner consistent with the right of the public to follow and monitor the proceedings and result of their dispute."[13] But that principle does not alter the necessary showing to overcome the public's right of access. An everyday reality of doing business is the

---

[10] *Al Jazeera Am., LLC v. AT & T Servs., Inc.*, 2013 WL 5614284, at *5 (Del. Ch. Oct. 14, 2013).

[11] *Sequoia*, 2013 WL 3724946, at *2.

[12] *Al Jazeera*, 2013 WL 5614284, at *1.

[13] *Al Jazeera*, 2013 WL 5614284, at *7.

3

possibility that a business partner may end up in litigation in a public court. For information to be sealed from public view, the person seeking confidential treatment must make the showing required by Rule 5.1(b)(3), which applies equally to any "party *or* person" who wishes to keep a matter secret.[14]

Legrand's motion is cursory and conclusory. Legrand claims that the exhibits contain "confidential, proprietary, and commercially-sensitive business information."[15] Legrand asserts that disclosure of the information

> would subject Legrand to significant injury. Namely, Legrand's confidential, proprietary, and commercially-sensitive business information would be known to those within its industry, including competitors and those with which Legrand negotiates services. Competitors would have Legrand's pricing structure and understand the nature of its outsourced services, and vendors with whom Legrand negotiates would be privy to the terms to which Legrand has previously agreed. Such disclosure would cause Legrand economic harm because the availability of that information would disadvantage Legrand when competing for customers and negotiating with vendors.[16]

During argument, Legrand reiterated these conclusory assertions. Legrand also contended that mere disclosure of the existence of a relationship between Legrand and Zonoff, Inc., a defunct entity whose fate lies at the heart of this action, would cause Legrand competitive harm.

---

[14] Ct. Ch. R. 5.1(b)(3) (emphasis added).

[15] Mot. ¶ 13.

[16] *Id.* ¶ 14.

The contents of the exhibits do not support Legrand's characterizations. Legrand first asked to seal in its entirety a Joint Development Agreement between Legrand and Zonoff dated June 15, 2013. As the date evidences, the agreement's terms are more than four years old, a vintage which exceeds by more than a year the default three-year period for the expiration of confidentiality designations under Rule 5.1(g). The contents of the Joint Development Agreement are unremarkable. It is simply a common form master services agreement that sets forth general terms on which the parties will do business together. It contains customary recitals acknowledging a business relationship between the parties, several pages of "General Provisions," a section on indemnification, and routine provisions addressing confidentiality. It also contains provisions relating to intellectual property and licenses, which Legrand emphasized, but they too are standard and unremarkable. For example, they provide that each party retains title to the intellectual property that it brings to the deal.[17] Legrand has not carried its burden to show that the Joint Development Agreement, or any portion of it, warrants confidential treatment.

Legrand also sought to seal the appendices to the Joint Development Agreement, which included Statements of Work. The Statements of Work contain descriptions of the tasks to be addressed, but they too are relatively general. They resemble generic

---

[17] *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 714 (Fed. Cir. 2008) (discussing joint development agreement distinguishing "existing technology" and "new work" along similar lines); *see also* 2 Raymond T. Nimmer, *Law of Computer Technology* § 4:26 (4th ed. 2017) (discussing joint development arrangements and suggesting agreements "might provide that sole ownership of the intellectual property vests in the original author").

descriptions of the coding process, far removed from lines of code or innovative product features. By analogy to the tasks that litigators perform, the descriptions resemble items such as "draft complaint" or "depose key witnesses," rather than more particularized items that might warrant concern.

Legrand also focused in the Statements of Work on language specifying payment terms and per unit licensing fees. Legrand claimed that the disclosure of this information from 2013 might disadvantage Legrand in future negotiations. The conclusory assertion that a company faces an unsubstantiated risk of "economic disadvantage with respect to competitors and others within the industry" is not sufficient to overcome the principle of public access.[18] In this case, the pricing terms are from four years ago and concern services in the dynamic technology industry. Legrand has not provided any reason to think that the pricing remains current. There is nothing about the terms that implies they were specifically negotiated, as opposed to representing standard rates. Legrand has not carried its burden to show that the appendices warrant confidential treatment.

Legrand also sought to seal in its entirety an escrow agreement between Legrand and Iron Mountain Intellectual Property Management, LLC. This document is a standard form agreement, on a pre-printed form prepared by Iron Mountain, that governs an

---

[18] *Al Jazeera*, 2013 WL 5614284, at *4.

6

industry-standard software escrow between the parties.[19] The escrow agreement itself does not contain any technical information. Legrand has not carried its burden to show that the escrow agreement warrants confidential treatment.

Moving beyond these documents, Legrand claimed that its relationship with Zonoff was itself commercially sensitive and should not be revealed. Having evaluated Legrand's arguments, I find that there is no credible reason to believe that a standard, arms'-length relationship between Legrand and a software developer from over four years ago remains highly sensitive such that its disclosure would cause competitive harm. Moreover, the existence of the relationship and its terms are important facts for the case, because they are relevant to determining whether Zonoff entered into a contested transaction at the heart of the case in the ordinary course of business. A high-level understanding of the Legrand-Zonoff relationship is necessary for the court to decide the matter and for the public to understand the case.

Legrand has failed to show that any of the exhibits are highly sensitive such that Legrand would suffer serious harm sufficient to warrant keeping the exhibits out of the public record. Relatedly, Legrand has failed to show that the courtroom should be sealed for testimony regarding the commercial relationship between Legrand and Zonoff. Legrand's motion for confidential treatment is therefore denied.

---

[19] *See* Nimmer, *supra* note 17, § 7:136 ("So-called escrow agreements are often used to" facilitate "a third party arrangement in which source code is deposited, allowing for future access by the licensee if the licensor breached a stated condition or is unavailable.").